# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 28, 2010

## STATE OF TENNESSEE v. MARCOS ENRIQUE COLLAZO, SR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-A-832     Monte Watkins, Judge**

**No. M2009-02319-CCA-R3-CD - Filed September 29, 2011**

A Davidson County Criminal Court jury convicted the appellant, Marcos Enrique Collazo, Sr., of three counts of rape of a child, seven counts of rape by fraud, seven counts of statutory rape by an authority figure, and seven counts of misdemeanor assault. The trial court imposed a total effective sentence of 130 years in the Tennessee Department of Correction. On appeal, the appellant argues that the trial court erred in denying his motion to sever, that the trial court erred in denying his motion to exclude pornographic videos found in his bedroom, that the evidence was insufficient to sustain his convictions for rape by fraud and statutory rape by an authority figure, and that the trial court erred in sentencing. We conclude that the trial court erred in denying the appellant's severance motion. However, the error was harmless. Finding no further error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Katie Weiss and Emily Todoran (at trial) and Charles E. Walker (on appeal), Nashville, Tennessee, for the appellant, Marcos Enrique Collazo, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kristen Menke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

The Davidson County Grand Jury returned a multi-count indictment charging the appellant with seven counts of rape, seven counts of rape by fraud, and seven counts of statutory rape by an authority figure, all of which involved the victim, K.C.[1] The indictment also charged the appellant with three counts of rape of a child, namely A.C.[2]

At trial, K.C. testified that her date of birth was August 4, 1992. She stated that she lived with her father, her mother, and her two sisters, A.C. and V.C. K.C. said that during her freshman year in high school, she and her family moved from Chicago to Nashville to be closer to her father's family. K.C.'s family moved into the Iroquois Apartments in Bellevue. K.C.'s paternal grandmother and uncle, the appellant, shared an apartment in the same complex. The appellant's bedroom was upstairs in the apartment he shared with his mother.

K.C. said that she did not have many friends in Chicago and that after she and her family moved to Nashville, she did not know many people. She had a good relationship with her family and agreed that their arguments were usually about "typical teenage stuff." K.C. said that because she and her family did not know many people, her parents did not want her and her sisters to be alone at their apartment after school. Therefore, her parents arranged for K.C. and her sisters to stay at the appellant's apartment until they returned home from work.

K.C. said that prior to moving to Tennessee, she became interested in studying the "gothic subculture," witchcraft, and different religions, including Wicca. She explained that "gothic subculture" was "not people that like to just dress in black and they look really scary. It's just, like, a way of expressing yourself, not trying to look like everyone else just being different and being yourself." She said that her views differed from her parents and that she did not discuss the subject with them.

Near the end of K.C.'s freshman year, her relationship with the appellant changed. K.C. said that she was frequently alone with him because she got home from school earlier than her sisters. During the time she spent with the appellant, K.C. told him about her interests. The appellant told her that he shared her interests, and they formed a close bond. K.C. said she trusted the appellant. She told him that she was looking for someone special and that she was afraid that no one would like her. The appellant told K.C. that he knew about Wicca, that he had magic powers, and that he could read minds. He also told her that

_____

[1] It is the policy of this court to refer to minor victims of sexual offenses by their initials.

[2] The indictment further charged the appellant with the aggravated sexual battery of V.C. However, the count relating to V.C. was severed prior to trial.

he had a black candle which gave him visions and allowed him to see into the future. K.C. said that the appellant lit his black candle and that the flame pointed towards her. He told her that "the candle thought that [she] was doubting him." K.C. said the appellant made it look real, so she believed him.

K.C. said that the appellant repeatedly told her that she could get magic powers by having sex with him, and she eventually capitulated. The first incident occurred in the appellant's bedroom, where they had been talking and watching television. The appellant played a pornographic video to distract her and blindfolded her with a black bandana. K.C. stated that the appellant inserted his penis into her vagina and that she began crying. She told him that she was scared and wanted to stop. At first, the appellant said that he could not stop. However, after K.C. repeatedly told him to stop, he complied. K.C. said she was terrified, in pain, and bleeding.

K.C. said that the next incident happened approximately one week later in the appellant's bedroom. During the week, the appellant told K.C. that he was weak because she had not let him "finish," which meant have an orgasm. The appellant told K.C. that she had taken some of his powers and that he needed to "finish" to get them back. He told K.C. that he would die in his sleep because of his weakness. The appellant also acted as if he were in a lot of pain. K.C. said she was worried about the appellant, so she agreed to have sex with him. She stated that the appellant again penetrated her vaginally.

K.C. estimated that she and the appellant had sex approximately twenty times, once in her bedroom and the other times in his bedroom. Each time, the appellant told her that he needed sex because he was in pain. The appellant told K.C. that his entire body hurt and that if he died from the pain, he would come back to haunt her. K.C. said, "He meant it to be a joke and I laughed, but I didn't really think it was funny and I was scared."

K.C. stated that the appellant had pornographic videos which he played during approximately half of the incidents. The appellant kept his pornographic videos in a cabinet under his fish tank. K.C. identified videos that were seized from the appellant's bedroom as the pornographic videos. She said that one of the videos was a "Japanese cartoon[]." The other videos were "First Time Teens, Teenage Heartbreakers, Teen Dream Number Thirteen, [and] Young as They Come." K.C. also identified photographs of the appellant's bedroom. A black bandana, a fish tank, and two candles were visible in the photographs. One of the candles was black with "red stuff" in it, which the appellant said was his blood.

K.C. recalled that the appellant usually convinced her to have sex by saying he was in pain. However, on one occasion during the summer when K.C.'s sister, A.C., was scheduled to have surgery on her knee, the appellant told K.C. that she needed to have sex

with him so that he would have the power to heal A.C. He said that if she refused, A.C. would be crippled. K.C. said she felt bad and wanted A.C. to get well, so she had sex with the appellant.

K.C. recalled that the last incident happened after the appellant told K.C. that he had looked into his candle and saw that her mother, who was scheduled to have surgery, was going to die. Because she was frightened for her mother, K.C. had sex with the appellant. Her sisters were usually downstairs when the offenses occurred.

K.C. said that in addition to vaginal intercourse, the appellant had her touch his penis with her hand approximately five times. He told her to move her hand back and forth. She complied, hoping that he would not ask to have sex with her. He also requested that she perform oral sex on him, but she refused. K.C. said the appellant performed oral sex on her two or three times in his bedroom. She said he also digitally penetrated her and touched her breasts, over and under her clothes, almost every time they had sex. K.C. said that the appellant attempted to have anal sex but that she moved away from him. She said the appellant laughed at her, making her feel worse about what was happening.

K.C. said that the last incident occurred in September following her mother's surgery. She told the appellant that she did not want to have sex with him anymore. She gave the appellant excuses, saying she was tired from school or having her period. She recalled that every time she rebuffed him, the appellant acted angry and would not talk to her. He told her that she did not care about him and that she must want him to die.

K.C. stated that during her sophomore year, she told some friends and her ex-boyfriend about the abuse. The next day, her ex-boyfriend insisted that she tell the guidance counselor. When K.C. disclosed the abuse to the school authorities, she was taken to the Child Advocacy Center (CAC) and was examined by members of the Our Kids Center.

K.C. stated that the only family member she told about the abuse was A.C., explaining that the appellant was also abusing A.C. K.C. said the appellant told A.C. "[s]ome of the same things." Specifically, K.C. recalled that once when they were in the appellant's bedroom, the appellant told her and A.C. that he was weak and sick and needed them to have sex with him to give him strength. K.C. said that she did not want to have sex with the appellant and that she told A.C. not to have sex with him. However, because A.C. was concerned about the appellant, she went upstairs to the appellant's bedroom and had sex with him. When A.C. came downstairs, she told K.C. that "she guessed [the appellant] was feeling a little bit better."

K.C. said that her grades started to drop because of the abuse and that the appellant

implied she was not to tell her parents about the abuse. The appellant told K.C. that her parents did not understand her as well as he did and that her parents thought she was a "problem child." K.C. said she was afraid that if she told her parents about the abuse, her father would "do something bad and end up in jail." She also feared that her parents would think she was lying and throw her out of the house.

A.C. testified that she was eleven years old and in the fifth grade when her family moved to Nashville. She said that she and her sisters often stayed at the appellant's apartment. She said that the appellant shared her love of music and that she and the appellant bonded by recording music together. She said they also bonded because they were both middle children.

A.C. recalled that near the end of fifth grade, she got sick at school and that the appellant picked her up. When they got back to his apartment, A.C. asked the appellant about sex. A.C. said that because her friends talked about sex, she felt left out when she did not understand the discussion. The appellant told A.C. about sex, explaining "that when people had sex that the sperm would come out from the penis and the woman could become pregnant." He also showed her some "Anime" pictures depicting people having sex. A.C. asked if the appellant had more pictures, and he said yes.

The appellant showed A.C. pornographic videos depicting people who appeared to be teenagers or older having sex. During the videos, the appellant told A.C. "that he was horny and that he was in pain and that if [she] didn't help him that he could die." The appellant asked A.C. to help him. A.C. said that the appellant appeared to be in pain and that she believed the appellant's claim. Because she cared about the appellant, she "helped him." The appellant asked if she wanted to see what was happening. When she said no, he blindfolded her with a black bandana. She stated that the appellant touched her vagina with his penis and that it hurt. When she told the appellant about the pain, he told her that "the first time always hurts." A.C. said that when K.C. came home, the appellant told her that he and A.C. had "experimented." A.C. said she knew the appellant was also having sex with K.C.

A.C. said that a few days later, K.C. had sex with the appellant in his bedroom, but he did not have an orgasm. The appellant asked A.C. to help him, stating that he would die if he did not "finish." A.C. said that she agreed and that the appellant penetrated her vagina with his penis.

A.C. also described a third incident. She said that the family was playing in the pool and that the appellant went to his apartment to put on his swimming trunks. A.C. went with him. He told A.C. to touch his penis with her hand. Although she did not want to, she

complied. The appellant claimed he was in pain, so A.C. had sex with him. A.C. said that all three incidents happened in the summer of 2007.

A.C. said the appellant told her that he could communicate with their deceased grandfathers. Additionally, he had a black candle and told her that he had magic powers. The appellant told her he could see into the future and could tell A.C. and K.C. who their boyfriends and husbands would be. The appellant said that he could will his powers to A.C. if she touched him. A.C. said she believed him.

A.C. stated that she did not tell her parents because she feared they would not want her anymore and would give her away. Also, the appellant told A.C. that he would kill her if she told her parents.

A.C. said that the appellant was arrested around Thanksgiving 2007 and that she was interviewed by a woman about the abuse. She told the woman that she had sex with the appellant the first time because he said he had magic powers and could see A.C.'s soul mate. She later told the woman that the first time she had sex with the appellant occurred after he showed her a pornographic video and said he was in pain. She explained that she gave different versions of events "because I made myself forget and I remember now."

Metropolitan-Nashville Police Detective Jeff Wiser testified that on November 30, 2007, he met the victims and someone from the Department of Children's Services (DCS) at the CAC to discuss the appellant's molestation of the victims. At the CAC, the victims were interviewed. After the interviews were completed, Detective Wiser met with the victims' parents. He asked one of them to wear a body wire and attempt to gain an admission from the appellant. Later that day, the victims' father agreed to wear the body wire and confront the appellant.

Detective Wiser said that the victims' father went to the Criminal Justice Center (CJC) where he was equipped with a body wire. According to the plan devised by police, the victims' father parked his car in the lot near the appellant's apartment and had the appellant get into the car with him. The conversation was recorded, and the recording was played for the jury.

During the conversation, the victims' father confronted the appellant, saying that K.C. had revealed that the appellant had sexually abused her. The appellant said that "nothing really happened." He said that K.C. asked him about sex, and he explained sex to her. The victims' father told the appellant that he did not believe him and that K.C. said that A.C. had also been abused. The appellant said that he had shown the victims "some Anime shit." He surmised that the victims made the allegations because they were mad at him for disciplining

them.  The victims' father asserted that he had been told details of the abuse, including the appellant's claims that he had magical powers and that he was in pain.  The appellant denied the accusations.  The victims' father pressed the issue, saying he knew the appellant had penetrated both K.C. and A.C.  He said the victims just wanted the abuse to stop.  He told the appellant that he understood that the appellant could be reacting to abuse he suffered as a child.  The appellant said he "had a feeling" the subject would "come up."  He stated that he was able to engage the victims in sex because they "were curious."  The appellant said that he was scared the first time he had sex with A.C.  He said, "They were my nieces, my blood, my little brother's babies."  He said he did not know how many times he had sex with K.C.  He said the victims "put me in a certain level that it was hard to get out of."  The appellant said that K.C. reminded him of a girlfriend who had died in an accident and that he had tried to avoid being alone with K.C. because she reminded him of his deceased girlfriend.  The appellant stated that he tried to block a lot of it from his memory.  He maintained, "It wasn't all me. . . .  They were so curious."  He said that the victims did not behave like children when they asked him about sex.  He said they "made me go to a certain level . . . .  Kids do that to me."  He stated that he did not use a condom because K.C. did not want him to.  The appellant said that he was not "turned on" by children.  He said that "the way [he and the victims] talked about things, all of us got turned on."

Detective Wiser testified that at the end of the conversation between the victims' father and the appellant, the appellant was arrested.  Detective Wiser said that as the victims' father got out of the car, he fell to the pavement and started crying.

Detective Wiser said that police searched the appellant's bedroom.  They found pornographic videos and a black bandana.  Detective Wiser said that after the appellant was arrested, he never complained about a physical disability, discomfort, or pain.

Michelle Ray with the Davidson County Sheriff's Office said that she was the "contact person for the inmate phone system."  Detective Jeff Wiser contacted her about recordings of telephone calls the appellant made from jail to his mother.  Ray made copies of the telephone calls and put them on a compact disc.  The recordings of the appellant's jail telephone conversations with his mother and sisters were played for the jury.  During one of the calls, the appellant spoke with his sister and asked what was happening at his mother's apartment.  His sister said, "Let's see, you raped your nieces and you're asking what happened?"  She asked if he had anything to say, and he said no.  When the appellant's mother got on the telephone, she asked the appellant, "What have you done?"  She asked the appellant if he was guilty of the accusations.  When the appellant did not respond, his mother said she believed his silence meant he was guilty.  He said the victims caught him "in a weak moment," and he asked his mother to forgive him.  She told him that the victims were "devastated" because the appellant "manipulated" their trust in him.  The appellant said that

-7-

he knew he would have to pay for what he had done, but he claimed that he was "blacking out things" and could not recall doing them. The appellant said that he was ashamed.

During another call, a different sister told the appellant to stop calling their mother. The appellant told her that she did not understand and that he had been under the effects of medication.

Sue Ross, a pediatric nurse practitioner, testified that she worked with the Our Kids Center, "an outpatient facility of General Hospital," which sees children following allegations of sexual abuse. She said that the nurse practitioner who examined K.C. and A.C. was unavailable to testify at trial; nevertheless, Ross testified from the reports made of the victims' examinations.

Ross stated that because the allegations had not been made within seventy-two hours of the sexual abuse, the victims were seen at the Our Kids Center office on Hayes Street instead of at the hospital. Ross explained that a rape kit was not performed because of the length of time since the last instance of abuse.

According to the report, K.C. said she had sexual contact with the appellant "dating back to May of '07." K.C. reported "penile-vaginal penetration[,] . . . digital contact with the breast, penile contact to her hands, and oral contact to her genitalia." K.C. was tested for pregnancy and sexually transmitted diseases. The tests were negative.

Ross testified that K.C.'s physical examination revealed a "hymenal transection," which indicated that "there ha[d] been penetrating trauma to the area" consistent with K.C.'s allegations of penile penetration. K.C. also reported that after the first incident of abuse, she felt a burning sensation when she urinated and pain when she walked. Ross opined that these symptoms were also consistent with sexual abuse.

Ross stated that A.C. also reported penile-vaginal contact and/or penetration; however, the physical examination revealed no findings of sexual abuse. Ross asserted that findings indicating "blunt penetrating trauma" were "the exception. It's not the norm." She said that medical personnel are typically unable to find physical evidence to support sexual abuse claims.

The victims' father testified that he, his wife, and his daughters moved from Chicago to Nashville on June 17, 2006, to be closer to his mother; his brother, the appellant; and his sisters. He said he encouraged the victims to bond with the appellant, thinking the appellant would be as protective of the children as he was. He stated that he had no reason not to trust the appellant.

The victims' father said that he knew the appellant had a back injury and was on disability. However, he said the appellant never displayed any noticeable signs of pain.

Around November 30, 2007, the victims' father learned that the appellant had molested K.C. and A.C. He said that his first reaction "was not a very humane one"; however, he promised the victims that he would not kill the appellant. Instead, he agreed to wear a body wire for police.

The sole defense witness was Craig Glisan, the Assistant Director of Nursing at the CJC. He said that the appellant's medical chart reflected that the appellant had a laminectomy in the lumbar region of his spine because of degenerative disk disease. He said that degenerative disk disease could cause symptoms such as numbness in the lower extremities, moderate to severe intermittent pain, or decreased flexibility in the lower back. He also stated that a male suffering from degenerative disk disease could have sexual difficulty or dysfunction which could affect the ability to have an erection or the strength of the erection. However, Glisan stated that while the appellant was confined in the CJC, he never reported any symptoms other than pain and numbness in his left foot.

Regarding K.C., the jury found the appellant guilty of seven counts of rape by fraud, a Class B felony; seven counts of statutory rape by an authority figure, a Class C felony; and seven counts of assault, a Class A misdemeanor, as a lesser-included offense of rape. Regarding A.C., the jury convicted the appellant of three counts of rape of a child, a Class A felony. The trial court imposed a sentence of twenty years for each rape of a child conviction, ten years for each rape by fraud conviction, three years for each statutory rape by an authority figure conviction, and eleven months and twenty-nine days for each assault conviction. The court merged the assault and statutory rape convictions relating to K.C. into the rape by fraud convictions and ordered that the sentences for rape by fraud be served consecutively. The court further ordered that the sentences for rape of a child be served consecutively to each other and consecutively to the rape by fraud sentences, for a total effective sentence of 130 years.

On appeal, the appellant argues that the trial court erred by denying his motion to sever, that the trial court erred by denying his motion to exclude the pornographic videos found in his bedroom, that the evidence was insufficient to sustain his convictions of rape by fraud and statutory rape by an authority figure, and that the trial court erred in sentencing.

## II. Analysis

A. Timeliness of the Notice of Appeal

-9-

Initially, we must address the State's contention that the appeal should be dismissed for failure to file a timely notice of appeal. The record reflects that the trial court entered an order denying the appellant's motion for new trial on September 4, 2009. On November 13, 2009, the trial court entered an order appointing appellate counsel and allowing the appellant to proceed with his appeal to this court. The appellant filed a notice of appeal that same day. The State contends that the trial court lost jurisdiction over the case on October 4, 2009, thirty days after the entry of the order denying the appellant's motion for new trial, and, therefore, that the court's order appointing appellate counsel was a nullity. The State further contends that because appellate counsel filed a notice of appeal on November 13, 2009, beyond the thirty-day time limit for filing, the notice was untimely.

Rule 3(b) of the Tennessee Rules of Appellate Procedure provides that a criminal defendant may appeal to this court following "a final judgment in a . . . post-conviction proceeding." Rule 4(a) of the Tennessee Rules of Appellate Procedure instructs that

> the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from; however, in all criminal cases the "notice of appeal" document is not jurisdictional and the filing of such document may be waived in the interest of justice.

Clearly, the appellant's notice of appeal was filed beyond the thirty-day time limit. However, this court may waive the timely filing. In the interest of justice, we will excuse the late filing and address the appellant's issues.

## B. Severance

The appellant was charged in a multi-count indictment with the offenses involving K.C., A.C., and V.C. Prior to trial, the appellant filed a motion to sever the counts relating to each victim. The appellant argued that the counts did not involve a common scheme or plan and "that evidence of each set of alleged offenses would [not] be admissible upon a trial of the others."

At the severance hearing, Eric Fitzgerald, a detective with the Metro Sex Crimes Unit, testified that he assisted in the investigation of the charges against the appellant. Detective Fitzgerald said that there were allegations that the appellant molested his nieces, K.C. and A.C., in his bedroom. Detective Fitzgerald said that "[a]s far as how it would have transpired it was, kind of, the same with all of them." He said the appellant told the victims that he was weak and ill, that he had magic powers, and that he needed the victims to help him rejuvenate by having sex with him.

Detective Fitzgerald stated that the appellant told K.C. that her mother might die during surgery and that he needed to have sex in order to have the powers necessary to heal her mother. He also told K.C. that she needed to have sex with him so that he would have to power to heal A.C. after her knee surgery. The appellant told K.C. that he believed she was the reincarnation of his deceased girlfriend.

Detective Fitzgerald stated that both K.C. and A.C. said the appellant showed them "carto[o]n porno." Police discovered pornographic videos in the appellant's bedroom in the location the victims described. Detective Fitzgerald said that when the victims' father wore a body wire, the appellant admitted to him that he had watched pornographic videos with the victims and had molested them.

Detective Fitzgerald said that both of the victims were virgins with limited sexual knowledge prior to being abused by the appellant. Additionally, the appellant used a blindfold on both victims.

The State conceded that the count involving V.C. should be severed. However, the State argued that the offenses involving K.C. and A.C. were part of a common scheme or plan because the appellant told both victims that he had magic powers and that he needed sex to alleviate his pain. Additionally, the appellant blindfolded them and showed both of them pornographic videos. Further, all but one offense with each victim occurred in the appellant's bedroom. The State argued that the evidence of offenses involving each victim would be admissible at the trial of the other because "[i]t establishes a complete picture for the jury of the relationships between the parties." Further, the State contended that the appellant's confession to the victims' father related to both victims. The appellant argued that the incidents were similar but that the sexual acts were separate.

At the conclusion of the severance hearing, the trial court said,

> You know, I hear a lot of these case[s] and the Court ordinarily will grant a severance in a case similar to this. But the Court believes that this does present a case where there is a common scheme or plan; and, so, the trial involving [K.C.] and [A.C.] will be tried together.

On appeal, the appellant argues that the trial court erred in denying his motion to sever. Specifically, the appellant contends that in order to consolidate the offenses involving K.C. and A.C., the trial court was required to find that there was a "common scheme or plan" and that evidence of one crime would be admissible in the trial of the other. The appellant contends that neither requirement was met. The State concedes that the trial court erred in failing to sever the offenses involving K.C. from the offenses involving A.C., acknowledging

-11-

that the trial court failed to find that the evidence of the charges involving one victim would be admissible in the trial involving the other victim. However, the State maintains that this error was harmless.

Rule 8(b) of the Tennessee Rules of Criminal Procedure states that two or more offenses may be consolidated for trial if "the offenses constitute parts of a common scheme or plan" or if "they are of the same or similar character." See Tenn. R. Crim. P. 8(b). Rule 13(b) provides that the trial court may order severance of offenses prior to trial if such severance could be obtained on motion of a defendant or the State pursuant to Rule 14. See Tenn. R. Crim. P. 13(b). Tennessee Rule of Criminal Procedure 14(b)(1) provides that "[i]f two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others."

Our supreme court has held that "decisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999). As a trial court must decide the motion based solely upon evidence adduced at the hearing on the motion, this court should look to that evidence and the trial court's findings of fact and conclusions of law to determine whether the trial court's ruling was an abuse of discretion. Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000).

In examining a trial court's determination on a severance issue, the primary consideration is whether the evidence of one offense would be admissible in the trial of the other if the offenses remained severed. Id. Our supreme court has emphasized the need to establish the "substantial interrelationship between the evidence required to prove each of several offenses." State v. Johnson, 342 S.W.3d 468, 475 (Tenn. 2011). Specifically, the court noted that "when 'the proof or defense of one charge necessarily involves the proof or defense of another charge, sequential prosecutions of the two charges burden both the defendant and the state with repetitive presentation of evidence.'" Id. (quoting People v. Rogers, 742 P.2d 912, 919 (Colo. 1987)).

Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" Spicer, 12 S.W.3d at 445 (quoting Moore, 6 S.W.3d at 239). As such, the trial court must determine from the evidence presented that:

> (1) the multiple offenses constitute parts of a common scheme

or plan, (2) evidence of [the] offense is relevant to some material issue in the trial of . . . the other offenses, and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Id. (citations omitted); see also State v. Dotson, 254 S.W.3d 378, 386 n.5 (Tenn. 2008).

In the instant case, the trial court found that the offenses were part of a common scheme or plan. Generally, common scheme or plan evidence falls into one of three categories:

(1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

Moore, 6 S.W.3d at 240. Our supreme court has stated that "[e]ven though offenses may be similar in many respects, they cannot be classified as signature crimes if they lack a distinct modus operandi." Shirley, 6 S.W.3d at 248.

Furthermore, this court has previously noted, "A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), overruled on other grounds by Spicer, 12 S.W.3d at 447. Under Tennessee Rule of Evidence 404(b), evidence that a defendant committed a harmful act other than the one for which he is on trial may be admissible. See Neil P. Cohen et al., Tennessee Law of Evidence, § 4.04[7][a] (LEXIS publishing, 5th ed. 2005).

In the instant case, the proof adduced at the severance hearing revealed that after earning his nieces' trust, the appellant exploited his relationship with them to gain sexual favors. The appellant told both victims that he had magic powers and that he could rejuvenate himself by having sex with them. He told both victims that he was in pain and required sex to alleviate his pain. He showed both victims pornographic videos and blindfolded them. Based upon the foregoing, we agree with the trial court that the instant offenses were part of a common scheme or plan.

However, as the State acknowledges, the trial court made no specific findings regarding the admissibility of the offenses involving K.C. in the trial of the offenses involving A.C. or vice versa. The State concedes that this was error. We agree.

Regardless, the State contends that the error in denying the appellant's motion for severance was harmless. Our supreme court has explained that to determine harmless error in severance cases, the proper inquiry "is to determine what harm, if any, the [appellant] suffered as a result of the improper joinder of the offenses and whether the gravity of the error warrants a new trial." Dotson, 254 S.W.3d at 388. As the Dotson court explained, no conviction should be reversed on appeal "except for errors which affirmatively appear to have affected the result of the trial on its merits." Id. (internal quotations omitted); see also Tenn. R. App. P. 36(b). When determining the effect of an error, "considering the whole record, [t]he more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome on its merits." Id. (internal quotations omitted). In other words, "[t]he key question is whether the error likely had an injurious effect on the jury's decision-making process. If the answer is yes, the error cannot be harmless." Id. at 389.

The court in Dotson determined that the trial court erred in failing to grant Dotson's motion for severance. In examining the effect of the error, the court noted:

> While clearly sufficient to convict on each charge, the nature of the evidence presented against [Dotson] as to each and every element of the two robbery charges and the two indictments for aggravated robbery varies in quality and degree. In two of the robberies, there were two employees who witnessed the crimes; in each instance, one of the two victims made a positive identification. In the others, the one employee who was involved identified [Dotson]. At trial, however, the jury heard the collective testimony of all four eyewitnesses on each indictment. The similarity of the crimes, where the risk of prejudice is higher, naturally buttressed the State's theory on all charges and their various elements. Because the trial court erroneously refused to sever each indictment and provide separate trials, our obvious concern is whether a single jury could independently assess each charge on its individual merits. Any inference that [Dotson] had a propensity to rob cigarette delivery trucks would have been perfectly logical.

Id. at 389 (citation and footnote omitted).

We conclude that the instant case is distinguishable from Dotson. In Dotson, the State's proof was based primarily on the collective testimony of the eyewitnesses to the offenses. As our supreme court noted, the quality and degree of the testimony varied as to each offense. Id. The court concluded that "[t]he similarity of the crimes, where the risk of

-14-

prejudice is higher, naturally buttressed the State's theory on all charges and their various elements." Id. Such is not the case here. The appellant admitted to the victims' father that he committed the offenses, and the admission was recorded. The appellant also admitted his guilt to his mother during telephone calls he made from jail. Both victims testified in detail about the offenses, describing the manner in which the appellant persuaded them. Further, there were physical findings supporting K.C.'s version of events. Explaining its conclusion in Dotson, our supreme court stated that "we cannot be sure as to what evidence might have tipped the scales in favor of the State" and surmised that the jury likely convicted Dotson based upon his propensity to commit such crimes. Id. at 390. Unlike Dotson, the appellant's admission of guilt in the instant case was a critical factor, leading us to conclude that the jury did not rely upon propensity evidence to convict the appellant.

Finally, we note that the jury convicted the appellant of assault of K.C. as a lesser-included offense of rape. This verdict is a clear indication that the jury evaluated each charge and reached a verdict based on the individual proof of each offense. We conclude that the error in failing to sever the offenses did not have "an injurious effect on the jury's decision-making process." Id. at 389. Therefore, we conclude that the error was harmless.

## C. Admission of Videos

The appellant next contends that the trial court erred in denying his motion to exclude the pornographic videos which were found in his bedroom. The appellant argues that the evidence was inadmissible under Tennessee Rule of Evidence 404(b) which "specifically prohibits the State from introducing evidence of [a] person's character or a trait of character or other acts in order to show action in conformity with the character trait." In the alternative, the appellant argues that the videos should have been excluded under Rule 403 because the probative value of the videos was outweighed by their prejudicial effect.

Prior to trial, the appellant filed a motion to exclude under Tennessee Rule of Evidence 404(b) pornographic videos that police seized from his bedroom. At the hearing on the motion, the State did not address the Rule 404(b) issue but argued that the videos were relevant because the appellant played the videos for the victims "to set their minds at ease or to give them something else to think about while they were having sex."

The trial court stated,

> As a general rule most courts keep out prior bad acts. But these
> particular acts don't appear as really prior bad acts. These are
> acts that are occurring during this time period where these
> events allegedly occurred. And if, in fact, the young ladies saw
> these tapes the Court believes that it is relevant. . . . I don't fit

[the videos] into the 404 category because it is something occurring apparently simultaneously with the other alleged acts.

The record reflects that the videos were not played for the jury; instead, K.C. was shown the video covers. She read the titles aloud and identified them as the videos the appellant played for her. The titles included "First Time Teens, Teenage Heartbreakers, Teen Dream Number Thirteen, [and] Young as They Come."

The admissibility of evidence generally lies within the sound discretion of the trial court, and an appellate court will not interfere with the lower court's exercise of that discretion absent a clear showing of abuse. State v. Carruthers, 35 S.W.3d 516, 574 (Tenn. 2000). The trial court's discretion in determining the admissibility of evidence is generally circumscribed by the Tennessee Rules of Evidence, including evidentiary rules of relevance. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404 provides as follows:

(b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

-16-

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character.

The trial court found, and the State argues on appeal, that the videos were not prior bad acts because the appellant did not play them for the victims prior to the offenses. Instead, he played the videos "simultaneously" with the offenses.

The goal of Rule 404(b) is to bar character evidence regarding other acts which are "used to prove that a criminal accused acted in conformity with character"; in other words, the rule prohibits evidence used to prove the accused's propensity to commit the crime. Cohen, Tennessee Law of Evidence § 4.04[7][a]. In the instant case, the pornographic videos were not used to show the appellant's propensity to commit the crimes. The videos were used to corroborate the testimony of the victims, both of whom testified that the appellant showed them the pornographic videos prior to and while molesting them. Therefore, the videos were not evidence of *another* bad act; the videos were evidence of the *instant* crimes. See State v. Terry Stewart Moore, No. E2001-00153-CCA-R3-CD, 2002 WL 1787947, at *9 (Tenn. Crim. App. at Knoxville, Aug. 2, 2002) (concluding that evidence of defendant's conduct did not violate Rule 404(b) because "[t]he conduct was . . . not a prior bad act but a concurrent bad act inseparable from the commission of the crime"). Accordingly, we conclude the trial court did not err in admitting the videos under Rule 404(b).

Turning to the appellant's argument that the videos were inadmissible pursuant to Tennessee Rule of Evidence 403, we again note that the videos were used to corroborate the victims' testimony. Moreover, only the covers of the videos were shown to the jury; the

-17-

videos were not played in court. Therefore, the prejudicial effect of the videos was minimal. We conclude that the trial court did not err in finding that the videos were admissible.

## D. Sufficiency of the Evidence

The appellant contends that the evidence was insufficient to sustain his convictions for rape by fraud and statutory rape by an authority figure. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

### 1. Rape by Fraud

To sustain the appellant's rape by fraud convictions, the State was required to prove that the appellant engaged in unlawful sexual penetration of the victim and that the sexual penetration was accomplished by fraud. See Tenn. Code Ann. § 39-13-503(a)(4). Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). Regarding the rape by fraud convictions in counts 2, 5, 8, 11, and 14, K.C. testified that the appellant penetrated her vagina with his penis on five separate occasions. For the conviction in count 17, K.C. testified that the appellant performed cunnilingus on her. For the conviction in count 20, K.C. testified that the appellant digitally penetrated her.

Tennessee Code Annotated section 39-11-106(a)(13) provides that "'[f]raud' means as used in normal parlance and includes, but is not limited to, deceit, trickery, misrepresentation and subterfuge, and shall be broadly construed to accomplish the purposes of this title." This court has previously observed that

the Tennessee Supreme Court has set forth its interpretation of

the term "fraud" by stating that, "[a] person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation."

State v. Raymond Mitchell, III, No. M1996-00008-CCA-R3-CD, 1999 WL 559930, at *5 (Tenn. Crim. App. at Nashville, July 30, 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992)). Rape by fraud is a Class B felony. Tenn. Code Ann. § 39-13-503(b).

In the instant case, the appellant induced K.C. to have sex with him by telling her that he had magic powers and could give her magic powers through sex. The appellant argues that K.C. should not have believed his claims, especially after the first time when she failed to gain the magic powers. However, the appellant repeatedly told K.C., a fourteen-year-old child, that he was weak, in pain, and would die if she did not have sex with him. The appellant used a "magic" candle to convince her of his powers and threatened to haunt her after his death. The appellant further told K.C. that she needed to have sex with him to grant him sufficient power to heal her mother and A.C. after they had surgery; otherwise, they would be crippled or die. We conclude that the appellant's inducements constitute "fraud" and that the jury had sufficient evidence to convict the appellant of the rape by fraud of K.C.

2. Statutory Rape by an Authority Figure

The appellant does not dispute that K.C. was fourteen years old at the time of the offenses or that the acts of penetration did not occur. Instead, he contends that "a plain reading of the statute indicates that the [appellant's] position of trust has to be created by 'virtue of the [appellant's] legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration.'" Additionally, he contends that the State failed to prove he was in a position of trust over K.C. because the evidence at trial established that he was only K.C.'s "friend."

Tennessee Code Annotated section 39-13-532 provides as follows:

(a) Statutory rape by an authority figure is the unlawful sexual penetration of a victim by the defendant . . . when:

(1) The victim is at least thirteen (13) but less than eighteen (18) years of age;

(2) The defendant is at least four (4) years older than the

-19-

victim; and

> (3) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual penetration; or

> (4) The defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual penetration.

Statutory rape by an authority figure is a Class C felony. Tenn. Code Ann. § 39-13-532(b).

Statutory rape by an authority figure required that at the time of the offenses, the appellant was in a position of trust, <u>or</u> had supervisory or disciplinary power over the victim by virtue of the appellant's legal, professional or occupational status. Tenn. Code Ann. § 39-13-532(a)(3). The State was not required to prove both.

Regarding a position of trust, our supreme court has stated,

> The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

<u>State v. Kissinger</u>, 922 S.W.2d 482, 488 (Tenn. 1996).

The appellant claims that the proof showed he was only K.C.'s "friend." However, the evidence at trial established that the victims' parents entrusted him with the victims' care. The victims' father testified that he thought the appellant would take care of the victims as if they were the appellant's own children. Moreover, the appellant cultivated a relationship with the victims by showing interest in their hobbies, such as music and religion. After he formed a bond of trust with them, he exploited that bond and persuaded them to have sex with him. We conclude that the proof was sufficient to sustain the appellant's convictions for statutory rape by an authority figure of K.C.

E. Sentencing

-20-

The appellant challenges the trial court's imposition of an effective 130-year sentence, one hundred percent of which must be served in confinement. Specifically, he argues that the trial court erred in determining the length of each individual sentence and in ordering consecutive sentencing.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

### 1. Length of Sentence

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; State v. Carter, 254 S.W.3d 335, 343-44 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343.

> [A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence . . . [and are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act.

Id. at 345-46.

In the instant case, the appellant was convicted of three counts of rape of a child, a Class A felony, see Tenn. Code Ann. § 39-13-522(b); seven counts of rape by fraud, a Class B felony, see Tenn. Code Ann. § 39-13-503(b); seven counts of statutory rape by an authority figure, a Class C felony, see Tenn. Code Ann. § 39-13-532(b); and seven counts of assault, a Class A misdemeanor; see Tenn. Code Ann. § 39-13-101(b)(1). Generally, a standard, Range I offender is subject to a sentence of fifteen to twenty-five years for a Class A felony, eight to twelve years for a Class B felony, and three to six years for a Class C felony. See Tenn. Code Ann. § 40-35-112(a)(1)-(3). The maximum sentence that can be imposed for a Class A misdemeanor conviction is eleven months, twenty-nine days. See Tenn. Code Ann. § 40-35-111(e)(1).

At the sentencing hearing, the trial court found the following enhancement factors applicable:

> (1) The [appellant] has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (3) The offense involved more than one (1) victim;
>
> (4) A victim of the offense was particularly vulnerable because of age or physical or mental disability; and

(7) The offense involved a victim and was committed to gratify the [appellant's] desire for pleasure or excitement.

Tenn. Code Ann. § 40-35-114(1), (3), (4), (7).

In applying the foregoing enhancement factors, the trial court imposed a sentence of twenty years for each rape of a child conviction, ten years for each rape by fraud conviction, three years for each statutory rape by an authority figure conviction, and eleven months and twenty-nine days for each assault conviction. The court merged the assault and statutory rape convictions into the rape by fraud convictions, all of which related to K.C.

The appellant contends, and the State concedes, that the trial court misapplied enhancement factors (3) and (4). Regarding factor (3), that the offense involved more than one victim, our supreme court has held that a trial court cannot apply that factor where the charge is necessarily limited to a specific, named victim. See State v. Imfeld, 70 S.W.3d 698, 705-06 (Tenn. 2002). Because there was a specific, named victim in each offense for which the appellant was convicted, we agree that the trial court improperly applied enhancement factor (3).

Regarding factor (4), the particularly vulnerability of a victim, we note that the trial court may apply this factor in child sexual abuse cases; however, the factor "relates more to the natural physical and mental limitations of the victim than merely to the victim's age." State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). In other words, "[t]he factor can be used in [a child sexual abuse] case if the circumstances show that the victim, because of his [or her] age or physical or mental condition, was in fact 'particularly vulnerable,' i.e., incapable of resisting, summoning help, or testifying against the perpetrator." Id. In the instant case, the victims were fourteen and eleven years old at the time of the offenses. Nevertheless, there was no indication that they were incapable of resisting, summoning help, or testifying against the appellant. Therefore, the trial court should not have applied this enhancement factor.

Regardless, the trial court properly applied two enhancement factors. First, the trial court applied enhancement factor (1) based upon the appellant's testimony at the sentencing hearing that he had used marijuana for approximately twenty years, demonstrating a history of criminal behavior.

Further, our supreme court has explained that when dealing with sexual crimes and the application of enhancement factor (7), concerning the appellant's desire for sexual arousal or gratification, the trial court must look to the appellant's "motive for committing the offense." State v. Arnett, 49 S.W.3d 250, 261 (Tenn. 2001) (emphasis in original). The

court cautioned that "evidence of ejaculation, by itself, does not prove that the [appellant's] motive was to gratify a desire for pleasure. Accordingly, proper application of factor (7) requires the State to provide additional objective evidence of the [appellant's] motivation to seek pleasure or excitement through sexual assault." Id. at 262 (citing State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996)). To this end, the court explained that "factor (7) may be applied with evidence including, but not limited to, sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the [appellant's] enjoyment" of the crime. Id.

K.C. testified that the appellant made her kiss him and that he fondled her breasts when he molested her. K.C. also stated that each time, the appellant claimed he needed to "finish," meaning have an orgasm. On one occasion, when K.C. was unable to "help" the appellant "finish," he asked A.C. to assist him. A.C. testified that the appellant asked her to have sex because he was "horny." Additionally, both victims testified that the appellant showed them pornographic videos. Therefore, the trial court did not err in applying enhancement factor (7). Although the trial court misapplied enhancement factors (3) and (4), we conclude that the appellant's twenty-year sentences for rape of a child and ten-year sentences for rape by fraud were proper in this case.

## 2. Consecutive Sentencing

Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995).

In the instant case, the trial court ordered that the appellant's ten-year sentences for rape by fraud be served consecutively to each other. The court further ordered that the twenty-year sentences for rape of a child be served consecutively to each other and consecutively to the rape by fraud sentences, for a total effective sentence of 130 years. The trial court imposed consecutive sentencing upon finding that the appellant was

> convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the [appellant] and victim or victims, the time span of [appellant's] undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage

to the victim or victims.

Tenn. Code Ann. § 40-35-115(b)(5).

Rape of a child is an offense involving the sexual abuse of a minor. Further, the appellant's convictions for rape by fraud involved a fourteen-year-old victim. The record reveals that the appellant actively sought to gain the victims' trust which he then exploited by convincing the victims to have sex with him. The appellant engaged in this course of action for at least four months. K.C. testified that her grades started dropping because of the abuse. Both K.C. and A.C. testified that they did not tell their parents about the abuse because they feared their parents would no longer want them. In a victim impact statement, the victims' mother stated that both victims experienced nightmares and received counseling. Therefore, the trial court did not err by imposing consecutive sentencing.

### III. Conclusion

We conclude that the trial court did not err in finding that the pornographic videos were admissible. We further conclude that the evidence was sufficient to sustain the appellant's convictions. Although the trial court erred in denying the appellant's severance motion, the error was harmless. Finally, the appellant's 130-year sentence was appropriate. Accordingly, the judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE